## No. 27,848.

Nora Foley, as Administratrix, etc., *Appellee*, v. L. M. Crawford et al., *Defendants;* The Amusement Syndicate Company, *Appellant.*

(264 Pac. 59.)

### SYLLABUS BY THE COURT.

1. Death—*Evidence as to Cause of Death—Broken Neck.* It does not take expert testimony to prove that the death of a boy, found with a broken neck and other injuries, was caused by his neck being broken.

2. Release—*Reliance on Fraudulent Representation—Examination of Witness.* To prove that the signature to an instrument was obtained by fraudulent representations, it is proper to ask these questions: Did you believe the statements that were made to you? Did you rely upon these statements? And did you sign the paper believing them?

3. Death—*Life Expectancy as Measure of Damage—Evidence.* Testimony of an experienced life insurance man concerning what the estimated earnings of a boy fourteen years of age would be until he reaches twenty-one years of age, based on tables of mortality and of earnings in general use by life insurance companies, may have been inadmissible; but its admission cannot be said to have been prejudicial.

4. Master and Servant — *Liability for Injury to Servant — Defective or Unfinished Elevator—Financial Condition of Installing Company Immaterial.* In an action against the owner of an uncompleted apartment house to recover damages for injuries sustained by the operator of an elevator which was being installed therein, it is not error to exclude evidence tending to show that the company installing the elevator is bankrupt.

5. Trial—*Special Interrogatories—Findings on Conflicting Evidence.* The fact that a jury finds in accordance with one side of conflicting evidence and answers special questions to agree with that finding does not show that the jury was influenced by sympathy, bias, or prejudice.

6. Master and Servant—*Liability for Injury to Servant—Assumption of Risk —Youthful Servant.* Neither a boy fourteen years of age nor his mother, who has consented to or procured his employment, assumes the risk of that employment in which he operates an elevator with a defective control and without a door, in an elevator shaft without doors, in an uncompleted apartment house, where the evidence does not show that either he or his mother knew the danger of operating such an elevator.

7. Trial—*Demurrer to Evidence—Sufficiency of Evidence to Compel Submis-*

Appeal and Error, 3 C. J. pp. 847 n. 91, 852 n. 26; 4 C. J. pp. 860 n. 12, 969 n. 56. Damages, 8 R. C. L. 760. Death, 17 C. J. pp. 1248 n. 99, 1306 n. 86, 1310 n. 43. Evidence, 22 C. J. pp. 536 n. 92, 611 n. 70. Master and Servant, 39 C. J. p. 808 n. 33; 21 L. R. A. n. s. 592; 18 R. C. L. 600; L. R. A. 1918F 195. Mortality Tables, 40 L. R. A. 555; L. R. A. 1918C 1063; 19 R. C. L. 217. Parent and Child, 29 Cyc. p. 1640 n. 81. Release, 34 Cyc. pp. 1054 n. 71, 1064 n. 51. Trial, 38 Cyc. pp. 1548 n. 26, 1910 n. 23, 1925 n. 72; 26 R. C. L. 1044. Witnesses, 40 Cyc. p. 2427 n. 28.

*sion.* There was evidence sufficient to compel the submission of the case to the jury, and a demurrer to that evidence was properly overruled.

8. SAME — *Special Interrogatories — Questions Not Covered by Evidence.* It was not error to refuse to submit certain requested special questions to the jury.

9. SAME — *Special Interrogatories — Responsiveness of Answers.* The answers of the jury to the special questions submitted were sufficiently direct and responsive.

10. SAME—*Instructions—Necessity of Objection to Predicate Error.* Complaint that instructions given should have included additional matter is unavailing in the supreme court where the instructions given did not incorrectly state the law, and where no objection was made to any of them, no modification of any of them was suggested, or no special instruction was requested.

11. DEATH—*Damages Recoverable by Parents for Death of Minor.* Where a minor child is killed through the negligence of another and leaves surviving him a father and mother, the damages recoverable for the death of the child go, under section 60-3203 of the Revised Statutes, one-half to the father and one-half to the mother. Each may settle for the damages sustained by him or her, but neither can settle for the damages sustained by the other without being authorized so to do.

12. RELEASE — *Validity — False Representations.* A written settlement of the mother's claim for damages on account of the death of her fourteen-year-old son obtained from her through false representations at a time when she was in such a mental condition that she did not fully understand and comprehend what she was doing may be avoided by her.

Appeal from Sedgwick district court, division No. 3; GROVER PIERPONT, judge. Opinion filed February 11, 1928. Affirmed.

*Ross McCormick,* of Wichita, for the appellant.

*John Madden* and *John Madden, Jr.,* both of Wichita, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff, as the administratrix of the estate of Joe Foley, the son of Nora Foley, commenced this action against L. M. Crawford and the Amusement Syndicate Company, a corporation, to recover for the death of Joe Foley, which occurred while he was operating an electric elevator in a building owned and being constructed by the Amusement Syndicate Company. After the introduction of the evidence the action was dismissed as to L. M. Crawford. Judgment was rendered against the Amusement Syndicate Company for $2,272.50. That company appeals.

Facts as follows were conclusively established by the evidence: The Amusement Syndicate Company was a corporation organized under the laws of the state of Kansas. L. M. Crawford was its

principal owner and manager. The company was erecting a six-story apartment building in Wichita. At the time of the accident to Joe Foley the building was incomplete, but it was partly occupied by tenants. An elevator was being installed in the building, and it was being used for the accommodation of the tenants occupying the building and for the accommodation of the workmen engaged in its erection. The elevator had no door in it. The openings into the elevator shaft were not closed. They had a "horse" or gate in front of them to prevent persons from walking into the elevator shaft without warning. Those "horses" or gates were operated by being moved back and forth by hand by those who desired to enter the elevator. The electrical appliances to the elevator were not complete, but it was so far constructed that it could be used. W. C. Henderson was employed by the Amusement Syndicate Company, through L. M. Crawford, to manage the building. Henderson, with the knowledge of Crawford, employed Nora Foley to operate the elevator. She was instructed in the manner of its operation by her son Joe Foley, who was a well-developed, intelligent boy fourteen years and one month old. She, with the knowledge and consent of Henderson, procured or permitted Joe Foley to operate the elevator after school hours while she was at home preparing the evening meal for her family. Mary Sargent lived in the building. She came home about five o'clock on the evening of the accident and asked Joe to take her up. He said, "No, I will come back for you." She went into her room and soon came back. She looked up and saw the elevator at the sixth floor. She looked down the elevator shaft and saw him at the bottom. She noticed hair and blood on the iron sills of the building on the edge of the elevator shaft. When Mary Sargent asked Joe Foley to take her up, he took the elevator to the top of the building. It crashed against the top of the building. The noise attracted attention. Inquiry and examination were immediately made, and he was found dead in the bottom of the shaft. His neck was broken, one of his legs was broken, and there were cuts and bruises about his head.

There was evidence which tended to prove that the control of the elevator was defective; that the elevator was being installed by W. V. Larsh for a company operating in Iowa; that, when it was determined to operate the elevator in its unfinished condition, Larsh objected; that Crawford had knowledge of the fact that Joe Foley was working on the elevator; that when Crawford saw the boy working in the elevator he directed Henderson not to permit him to

work in the elevator any more, but the boy continued to work; that on the day after the accident Crawford, for $1,000, procured from J. W. Foley and Nora Foley, the father and mother of Joe Foley, a written acknowledgment of settlement of all liability on account of the death of Joe Foley; that Crawford, who was a friend of Mrs. Foley, procured Mrs. W. C. Henderson, another friend of Mrs. Foley, to go to the latter and obtain her signature to the written acknowledgment of settlement on payment of the $1,000; and that when Crawford asked Mrs. Henderson to go to Mrs. Foley and get the acknowledgment of settlement signed, Mrs. Henderson objected on account of the amount that was being paid, to which Crawford replied that this was for her immediate necessities, that he would take care of Mrs. Foley in the future, and that if the settlement were not signed, he would stop the funeral.

The answer pleaded that settlement as a defense. The reply alleged that the settlement with Nora Foley had been procured by fraud, and that when she signed it she was not in a condition to understand its purport. There was evidence which tended to prove both of those facts.

1. The defendant says, "The court admitted incompetent evidence in behalf of the plaintiff and prejudicial to the defendant." Under this head, the defendant argues that—

"D. M. Hammers, an ambulance driver, not an expert witness, was permitted to testify, over proper objection, what was the cause of death."

This witness came with an ambulance to take the body of Joe Foley to the undertaker to prepare it for burial. He found the body lying in the pit at the bottom of the elevator shaft. He testified as follows:

"Q. In making your observations and examinations of Joe Foley you may state to the jury in your opinion and judgment as to the cause of his death? A. A broken neck."

The fact that the broken neck caused the death of Joe Foley does not seem to have been contested. It did not take an expert to testify that the boy's death had been caused by his neck being broken. Any intelligent person who examined the body could have testified to that fact.

2. The plaintiff was questioned concerning the conversation between herself and Mrs. Henderson when the plaintiff signed the acknowledgment of settlement for $1,000, as follows:

"Did you believe the statements that were made to you by Mrs. Henderson before you signed the paper? A. I did.

"Did you rely upon the statements that were made by Mrs. Henderson to you immediately before signing the paper? A. Yes, sir.

"Believing in what she told you and relying upon her statements, did you sign the paper? A. Yes, sir."

Those questions were objected to. The evidence was competent. How it could have been secured without asking the questions that were asked or others similar to them except by circumlocution, does not appear. Permitting questions of that character is largely within the discretion of the trial court. (*Ayres v. Probasco,* 14 Kan. 175; *State v. McAnulty,* 26 Kan. 533; *State v. Fooks,* 29 Kan. 425, 428.)

3. A life insurance man testified that Joe Foley's life expectancy was 46.16 years. He testified that, in his judgment based on tables compiled by life insurance companies, the earnings of a boy fourteen years of age until he should reach twenty-one years of age would be something like $980 a year. The evidence may not have been entitled to very much weight. It was a calculation—the judgment of an experienced life insurance man. It probably was as good a way as any to ascertain what would have been the possible earnings of Joe Foley—a question very hard to determine and very hard to prove. The court is unable to say that the evidence was inadmissible; but even if it was, it cannot be said to have been prejudicial.

4. The defendant contends that "the court erred in not allowing Mr. Crawford and Mr. Larsh to testify that the receiver of the elevator company was suing for the purchase price of the elevator. . . and . . . in not allowing Mrs. Crawford, secretary of the defendant company, to testify that she knew the elevator company was in bankruptcy court in Iowa and in the hands of a receiver." Whether or not the elevator was paid for and whether or not the elevator company was in bankruptcy and in the hands of a receiver was wholly immaterial. The defendant owned the building, was renting rooms therein to tenants, was operating the elevator, and employed the operator of the elevator.

5. The defendant contends that the jury was swayed by sympathy, bias, and prejudice in arriving at its verdict. That contention is based partly on the answers of the jury to special questions submitted, and partly on the fact that Mrs. Foley in a deposition given in an action to recover damages for the death of Joe Foley, in which Mrs. Foley's husband was plaintiff and the Amusement Syndicate Company was defendant, testified substantially in contradiction to her testimony given on the trial of the present action. Her explanation of her testimony in the deposition was that she did not remem-

Foley v. Crawford.

ber the statements that were therein made, and that at that time she was suffering from serious mental depression. On the trial of the present action, she also testified that she knew nothing about signing the statement of release for the $1,000. The evidence tended to show that that statement was signed in the presence of a number of witnesses. Those witnesses testified that she was not then in a mental condition to understand what she was doing.

The jury answered special questions as follows:

"1. Was the deceased injured while in the elevator? A. While on duty acting as operator of the elevator.

"2. If so, what injured him? A. No conclusive evidence.

"3. Was the elevator, on the 14th day of December, 1923, in the same condition it had been for some time relative to starting or stopping it? A. Yes.

"4. Was the deceased accustomed to the elevator and its operation? A. Yes.

"5. How did the body get where it was found? A. By falling down the shaft.

"6. Was the deceased at the time in good health and in possession of his ordinary faculties? A. Yes.

"7. What caused the death of the deceased? A. Broken neck.

"8. Did the deceased know how to stop the elevator when it was in motion? A. Yes; if control was working properly.

"9. What act or acts of negligence do you find defendants guilty of? A. By allowing an unfinished elevator in their building to be used and operated for public service.

"10. Was a settlement made by the mother of the deceased and the defendant? A. Yes; but by undue influence and misrepresenting facts the defendant took advantage of the plaintiff's mental condition, causing her to sign the agreement—therefore not binding."

The jury returned its verdict in accordance with the testimony given on the trial of the present action. The jury was the trier of facts. Those facts must be found from the evidence introduced on the trial. If that evidence was conflicting, it was the duty of the jury to ascertain the truth and return its verdict and findings accordingly. The answers to the special questions responded to the evidence on which the general verdict was based, conformed to that evidence, and did not conflict with the general verdict. It cannot be said that the jury, because it found in favor of the plaintiff, was influenced by sympathy, bias, or prejudice.

6. The defendant argues that Joe Foley and his mother assumed the risk of any injury which might be caused by the unfinished condition of the elevator, by its defective control, or by the uncompleted condition of the building. Joe Foley and his mother knew of

the condition of the shaft and of the door to the elevator, but the evidence did not disclose that either of them knew that the control was defective. There was no evidence to show that either of them knew or ought to have known and appreciated the danger to which he was exposed in operating the incomplete elevator with its defective control in the unfinished building. In *Brizendine v. Railroad Co.*, 96 Kan. 691, 153 Pac. 495, this court said:

"Rule followed that general knowledge of a situation does not bar recovery on the ground of assumption of risk unless the injured party appreciated the danger." (Syl. ¶ 3.)

That rule has been followed a number of times by this court. (*Railway Co. v. Bancord*, 66 Kan. 81, 71 Pac. 253; *Every v. Rains*, 84 Kan. 560, 569, 115 Pac. 114; *Suniga v. Railway Co.*, 94 Kan. 201, 146 Pac. 364.) Joe Foley was employed by the defendant. His mother could not for him assume the risk of danger arising out of his employment on the elevator so as to relieve the defendant from liability for his negligence.

Does a boy fourteen years of age who operates an elevator assume the risk of injury thereby when those injuries are caused by defects of which he has knowledge?

In 39 C. J. 808 it is said:

"Where a servant by reason of his youth or inexperience is not acquainted with the dangers incident to his employment, he does not assume the risk thereof until the master apprises him of the dangers, and gives him reasonable instructions as to how they may be avoided. The mere fact that the servant is willing to undertake the particular work does not relieve the master of the duty to give him proper instructions, as his failure to perform his duty in this regard is not a danger ordinarily incident to the service. Furthermore a young or inexperienced servant will not be held to have assumed the risks of his employment by reason of mere knowledge of the defect or danger, unless he is also aware of the nature and extent of the danger, and has sufficient discretion and capacity to comprehend the risk. But on the other hand his youth or inexperience will not excuse him if he does, or ought to, know and appreciate the danger to which he is exposed; and the lack of instruction or specific warning in regard to the dangers of the employment will not in these circumstances relieve the servant of the assumption of risk."

In *Olson v. Mercantile Co.*, 91 Kan. 563, 138 Pac. 598, this court said:

"In an action based on negligence in furnishing to an employee an unsafe team of horses, proof that the plaintiff, a boy of fifteen, was somewhat afraid of them, and after one runaway had complained to his employer that they were unsafe, and yet continued to drive them for five months, without any

promise having been made to remedy the matter, does not conclusively establish the defense of assumed risk."

In *Rank v. Packing Box Co.*, 92 Kan. 917, 142 Pac. 942, the rule was declared to be that—

"Where the operator of a saw did not appreciate the risk involved in dealing with a matter incident to its operation, his nonappreciation was excusable, and the duty of his employer to instruct and warn him had not been performed, he did not assume the risk involved in operating the saw." (Syl. ¶ 4.)

If we apply the principle declared in 39 C. J. and the principles found in *Olson v. Mercantile Co.*, supra, and *Rank v. Packing Box Co.*, supra, the conclusion is inevitable that neither Joe Foley nor his mother assumed the risk of the dangers of his employment in operating the elevator for the defendant. Assumption of risk was pleaded by the defendant, but that question was not submitted to the jury by the instructions, and the defendant did not ask for any instruction on that subject.

7. The defendant says: "No allegation in his (the plaintiff's) petition was made as to what acts of negligence alleged were the proximate cause of death. . . . And no proof was adduced that the acts of negligence alleged were the proximate cause of death." The defendant filed a demurrer to the evidence of the plaintiff; that demurrer was overruled. The Amusement Syndicate Company argues that the evidence was insufficient to entitle the plaintiff to recover. Most of the facts surrounding the death of Joe Foley were conclusively established by the evidence. There was no dispute about them; but the evidence did not establish what caused him to fall or get out of the elevator and to the bottom of the elevator shaft. There was nothing to show that fact except the conclusively established facts. Those facts showed that he was instantly killed; that he was killed by being knocked out of, by jumping out of, or by falling out of the elevator to the bottom of the shaft. He could not have been knocked out, could not have jumped out, or fallen out of the elevator if there had been a door to it, and the door had been closed. Probably the accident could not have occurred if there had been doors to the elevator shaft. The evidence tended to prove that the control of the elevator was not working properly. It was negligence for the defendant to operate the elevator without doors to the elevator shaft, without a door on the elevator, or without proper control. The circumstances tended to prove that all of

these three factors contributed to the death of Joe Foley. All three factors were alleged in the petition and were proved by the evidence. There was nothing to show contributory negligence on the part of Joe Foley. The evidence was sufficient to establish a case in favor of the plaintiff, and the demurrer thereto was properly overruled.

8. The defendant requested that a number of special questions be submitted to the jury, among which were the following:

"10. By whom, or by what, was the deceased thrown and knocked from the elevator, if you find that he was thrown and knocked?"

"11. Was the deceased at the time in good health and in possession of his ordinary faculties?"

"14. What caused deceased to fall?"

The court did not submit either of these three questions. The defendant argues that the court committed error in refusing to submit special questions numbered 10 and 14, and in refusing to allow the defendant to withdraw question No. 11 and substitute therefor question No. 10. There was no evidence to show by whom or by what Joe Foley was thrown or knocked from the elevator or how he got out of it. Neither was there any evidence to show what caused him to fall except that which showed the condition of the elevator shaft, the condition of the door to the elevator, and the condition of the control of the elevator. Questions submitted to a jury should be, not only within the issues framed by the pleadings, but also within the evidence.

In *L. & W. Rly. Co. v. Anderson*, 41 Kan. 528, 21 Pac. 588, it was declared that—

"It is the duty of the trial court to submit all special questions requested by a party when such questions are pertinent under the issues and evidence; but where no evidence has been given upon which the jury could intelligently answer the questions, *held*, not error to refuse to submit such questions to the jury." (Syl. ¶ 1.)

If no evidence has been introduced to prove a material fact, the court should take cognizance thereof and rule accordingly when the matter is properly challenged to his attention. The jury could not have answered questions numbered 10 and 14 in the form in which they were drawn, even if they had been submitted. For that reason, it was not error to refuse to submit them.

9. The defendant says that the answers of the jury to the special questions submitted were evasive, ambiguous, and not respon-

sive, and were inconsistent with each other. An examination of the answers discloses that they were as directly responsive to the questions as they could have been made under the evidence and the form of the questions submitted. Particular complaint is made of the answer to the first question. That question and answer read as follows:

"1. Was the deceased injured while in the elevator?   A. While on duty acting as operator of the elevator."

That question did not ask for an answer concerning what caused him to get out of the elevator. His injury may have occurred while he was in the elevator or after he got out of it. It did occur while he was on duty. The answer to the question was not evasive nor ambiguous; it was as fairly responsive to the question as it could have been made under the evidence; and it was not inconsistent with the answers to the other questions. The same may be said of all of the answers of which complaint is made.

10. The defendant complains of instructions numbered 4, 11 and 13 given by the court. Instruction No. 4 was as follows:

"4. You are further instructed that this action is brought by Nora Foley as administratrix of the estate of Joe Foley, deceased. Under our law the parents of the deceased would be the ones entitled to inherit his estate. In this case you are instructed that J. W. Foley, father of the deceased in question, has made full and complete settlement of any interest which he may have had in the estate, and it is conceded by plaintiff that any recovery, if any, which plaintiff might have in this case would be only as to one-half the total damage or loss occasioned by the death of the deceased."

The defendant argues that the court should have added these words:

"Less all payments heretofore made to both or either of the parents of the deceased, and less the probable expense of his maintenance."

Instruction No. 11 was as follows:

"You are further instructed that one of the defenses in this case is that if the defendant was under any legal liability arising out of the death of Joe Foley, the same has been settled and discharged by reason of payments made to Nora Foley and J. W. Foley.

"In case you find that Nora Foley and J. W. Foley, parents of the deceased, executed a release for the express consideration of one thousand dollars, that said release is valid and binding upon Nora Foley and she cannot recover, although you may find that the defendant company was guilty of negligence, and that such negligence, if any, was the proximate cause of the injury resulting in death of the deceased, unless you believe from the evidence that at the time that said release was executed by Nora Foley that she was in a

mental condition that she could not understand the nature and contents of the said release, or that the defendant through its agents willfully concealed from her the real meaning and contents of the said release and falsely represented to her the purport of said release, and that she relied upon such false representation, if such was made, and was thereby induced to sign said release without reading the same, or having it read, and without knowing its contents.

"It is for you to determine from all the evidence and circumstances in this case whether she in signing the release understood the contents at the time of signing; whether she intended to release, and understood that she was releasing, her claim and right of action against the defendant. Unless you find that the same was signed voluntarily and with an intention to release the defendant and with an understanding of its contents, it would not release the defendant from liability as to Nora Foley. If you further find from the evidence under these instructions that defendant would otherwise be liable, and such release should be disregarded by you in arriving at your verdict, and in such case one-half of any payments made should be deducted by you from any amount which you might determine the plaintiff entitled to recover."

The defendant contends that the clause reading, "And in such case one-half of any payments made should be deducted by you from any amount which you might determine the plaintiff entitled to recover," should have read in substance as follows: "And in such case one-half of all payments made to both or either of the parents of the deceased, or to the plaintiff in this action, less the probable expense of his maintenance, should be deducted by you from any amount which you might determine the plaintiff is entitled to recover."

The defendant argues that instruction No. 13 should have been modified so as to conform to its contentions concerning instructions No. 4 and No. 11.

The abstracts do not disclose that in the trial court any objection was made to any instruction, that any modification of any of them was requested, or that defendant requested any instruction to be given to the jury.

The fifth subdivision of section 60-2909 of the Revised Statutes, in part, reads:

"Before reading the instructions to the jury, the court shall, when requested, submit the same to counsel on either side and give counsel a reasonable time to suggest modifications thereof."

That statute contemplates that if either party to an action being tried thinks that the instructions are not full and complete, he should request a modification of them, and that if he does not request such a modification, he cannot complain of them.

In *Briley v. Nussbaum,* 122 Kan. 438, 440, 252 Pac. 223, an action by parents for the death of their daughter, this court said:

"The instruction concerning the right of the plaintiffs to the services of Hazel Briley did not incorrectly state the law. If the defendants had desired a modification of that instruction, it was their duty to request the court to give such a modification. That does not appear to have been done. They cannot complain of failure of the court so to do. (*State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406; *State v. Ross,* 77 Kan. 341, 348, 94 Pac. 270; *State v. Page,* 80 Kan. 389, 391, 102 Pac. 780; *Hamilton v. Railway Co.,* 95 Kan. 353, 357, 148 Pac. 648; *State v. Taylor,* 119 Kan. 260, 237 Pac. 1053.)"

The instructions given did not incorrectly state the law.

From the abstract of the defendant, it may reasonably be inferred that the instructions were in writing. The defendant had the right to see them before they were read to the jury, and could have seen them if a request had been made for permission to do so. The defendant could then have stated to the court wherein modification was desired and could have requested other or additional instructions. What the defendant desired to have in the instructions should have been made known to the court either by a request for a modification of the instructions given or by submitting to the court special instructions with the request that they be given.

11. There is another matter that should receive attention; that is, did the settlement with the father of Joe Foley bar the plaintiff's right to recover? Section 60-3203 of the Revised Statutes gives the right of action to the plaintiff as the administratrix of the estate of Joe Foley for the benefit of his father and mother. If a binding settlement for the death of Joe Foley had been entered into by them, probably the personal representative could not successfully maintain an action for his death. The father did settle. The mother avoids the settlement made by her. The father did not represent the mother when he made his settlement. The evidence tended to prove that after the settlement was made with the father, he commenced an action to recover for the death of the son, which action was also settled. The evidence also tended to prove that the father and mother were antagonistic to each other concerning the recovery for the death of Joe Foley. Without any attempt at settlement and without the appointment of a personal representative either the father or mother could have maintained an action to recover the damages sustained by him or her if the other had refused or neglected to do so. The right of each to recover was personal and several, not joint with each other. They could settle

separately or together, but each must settle for himself, unless he in some way authorized the other to settle for him.

In *Jeffries v. Elevator Co.*, 102 Kan. 811, 176 Pac. 631, the court declared that—

"A cause of action for the death of a workman, arising under the factory act, may not be compromised by the widow to the prejudice of an infant child entitled to share in the damages recoverable." (Syl. ¶ 3.)

That case was before this court again in *Jeffries v. Mercantile and Elevator Co.*, 103 Kan. 786, 176 Pac. 631, where this court said:

"When the deceased left a widow and child, and no personal representative has been appointed, the widow may bind herself and child by receiving payment in money, without suit for a fair, reasonable and just sum, in good faith considered the proper amount of damages sustained; she may bind herself by settlement with the wrongdoer on any consideration satisfactory to her; but she may not bind her child, except by proportional payment of the character described.

"By virtue of his or her control over litigation, the statutory agent may present to the court in which action has been brought a stipulation for judgment embodying a fair adjustment of the controversy, and if the court, after judicial examination, approve it and enter judgment accordingly, the parties will be bound, and the distributees will be bound." (Syl. ¶¶ 2, 3.)

In that opinion, the court further said:

"From what has been said it follows that the plaintiff could bind herself by settlement with the defendant on any consideration satisfactory to her; but she could not bind her child by the character of settlement which she did make." (p. 789.)

J. W. Foley, the husband of Nora Foley and the father of Joe Foley, could settle for the damages sustained by him on account of the death of his son, but he could not settle for the damages sustained by his wife. She was entitled to recover her damages, notwithstanding the settlement by him.

12. The court instructed the jury that if the release executed by Nora Foley and J. W. Foley for $1,000 had been executed by Nora Foley at a time when she was in such mental condition that she could not understand the nature and contents of the release, or if it was obtained from her by false representations, it would not be binding on her. The defendant complains of that instruction. Any contract or other instrument of writing signed by a person who is in such a mental condition that she does not understand its nature or sense, or whose signature is procured by fraud, is voidable by the person signing it. This is a known, familiar, general rule of law, and it is unnecessary to cite authorities to support it.

All other matters of which complaint is made are sufficiently discussed in what has already been said.

The judgment is affirmed.